**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JZ, et al., | No. CV-20-00490-TUC-RCC |
| Plaintiffs, | **ORDER** |
| v. | |
| Catalina Foothills School District, | |
| Defendant. | |

Plaintiffs J.Z. and E.J. ("Plaintiffs" or "Parents"), on behalf of their child, J.Z. ("J."), filed this matter appealing the decision[1] from an Administrative Law Judge ("ALJ") that found in favor of Defendant Catalina Foothills School District ("Defendant" or "the District") with regard to Plaintiffs' claims that Defendant violated the Individuals with Disabilities in Education Act ("IDEA"). (Doc. 1.)[2]

---

[1] The ALJ issued an Administrative Law Judge Decision on October 2, 2020 and an Amended Administrative Law Judge Decision on December 14, 2020 due to an error in which the ALJ originally excluded a finding on one of the issues in the case.

[2] For ease of reference, this footnote summarizes some of the lesser-known abbreviations used frequently throughout this Order:
ADHD: Attention Deficit Hyperactivity Disorder
PWN: Prior Written Notice
MDD: Major Depressive Disorder
ODD: Oppositional Defiant Disorder
IEP: Individualized Education Program
SST: Student Study Team
IEE: Independent Education Evaluation
FAPE: Free Appropriate Public Education

## I.    Factual Background

At the time of the events in question, J. had just completed the ninth grade at Catalina Foothills High School ("CFHS"). Two years earlier, J. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). R72[3] at A17. After this diagnosis, J. received accommodations ("504 Plan") in accordance with § 504 of the Rehabilitation Act of 1973. *Id.* Upon request, J. could take extra time to complete tasks, receive further clarification regarding assignments, and sit at the front of the classroom. R64 at 2.

### A. Academic Performance: Eighth and Ninth Grade

In the eighth grade, J.'s in-class grades were all within the "ideal learning zone" as defined by his middle school.[4] R72 at A43–46. His standardized test scores ranged from "Minimally Proficient," to "Proficient," to "Meets the Standard."[5] *Id.* at A47, A49, A51. J. was disciplined for vaping, but his middle school principal testified that, in general, J. was "a nice kid." *Id.* at A42; R92 at 448. At the end of the year, Defendant reviewed the 504 Plan and found that J. continued to qualify for accommodations for his ADHD. R64 at 1.

J. then began ninth grade at CFHS. His in-class grades were again average, generally earning C's.[6] R72 at A68. J.'s standardized test scores mirrored those from the

---

[3] The parties sent the administrative record as a separate disc. Thus, the Court will refer to the record as the parties have in their briefs, using "R" followed by the number that corresponds to the document as listed in the Index of Record of Review filed on April 9, 2021 (Doc. 16). The pincite refers to the page number as separately paginated by the parties. If the document has no separate pagination, the pincite refers to the number of the PDF page.

[4] The "ideal learning zone" was identified as having scores between 2.5 and 3.5. R72 at A43.

[5] On the English Language Arts Assessment ("ELA") portion of AzMERIT, a statewide standardized exam, J. scored in "Level 1 (Minimally Proficient)." *Id.* at A47. He also scored in "Level 3 (Proficient)" on the AzMERIT Math Assessment. *Id.* at A49. On another statewide standardized exam, Arizona's Instrument to Measure Standards AIMS Science ("AIMS Science"), J. passed with a score that fell within the "Meets the Standard" range. *Id.* at A51.

[6] In his first semester, J. earned the following grades: D in Global Issues; C+ in Spanish 1; C+ in Algebra 1; C- in Honors Biology; A- in Beginning Guitar; C+ in Honors English; and B- in Physical Education (a single semester class). R72 at A68. His second

previous year.[7] R67 at 1, 3, 5. He was disciplined twice in the ninth grade—once for calling a fellow student a terrorist and another time for using a vape pen in class. R72 at A53–54.

In April 2019, Defendant conducted its annual review of J.'s 504 Plan. R68. His teachers noted some concerns about J. not doing his work. *Id.* at 3–4. Defendant issued a Prior Written Notice ("PWN") to Plaintiffs recommending that the 504 Plan continue into J.'s tenth grade year because "[J.] is not achieving to his ability, and he needs accommodations in place to be successful academically." R72 at A65. Defendant further noted that J. "was not using the accommodations on his plan regularly, [therefore] the team felt the plan should stay in place so he could have a better chance at achieving academic success." *Id.* The school year ended shortly thereafter on May 22, 2019. (Doc. 17 at 2.)

**B.  Hospitalizations**

On May 31, 2019, J. was voluntarily admitted to Sonora Behavioral Health Hospital ("Sonora") with suicidal ideations. R56 at 2. His diagnoses upon admission were ADHD, Bipolar, and Major Depressive Disorder ("MDD") Recurrent. *Id.* at 4, 15. He stayed at Sonora for a week and a half. *Id.* at 19. His diagnoses upon discharge were ADHD, Unspecified Bipolar, and Cannabis Use Disorder. *Id.*

J. returned home for several weeks until he was voluntarily re-admitted to Sonora on July 1, 2019 with both suicidal and homicidal ideations. *Id.* at 51–52. He reported planning to hang himself and wanting to kill his mother. *Id.* at 52. The initial psychiatric evaluation reads, "During consult, the [patient] reported that he has been depressed for a very long time, & it is mostly due to 'family drama'." *Id.* Upon admission, J. was again

---

semester grades were similar: C in Global Issues; B- in Spanish 1; C+ in Algebra 1; D in Honors Biology; A in Beginning Guitar; B- in Honors English; and B in Health and Wellness (a single semester class). *Id.*

[7] He scored in "Level 2 (Partially Proficient)" on his AzMERIT ELA in Spring 2019. R67 at 1. On his AzMERIT Algebra I Assessment, he scored in "Level 3 (Proficient)" demonstrating "a strong understanding." *Id.* at 3. And on the AIMS Science, J. scored within the "Meets the Standard" range. *Id.* at 5.

diagnosed with ADHD, Bipolar, and MDD Recurrent. *Id.* at 53, 61. At the time he was discharged, J.'s diagnoses were ADHD and Bipolar. *Id.* at 1, 64. His parents then enrolled J. in Muir Wood, a short-term residential treatment center. R58 at 3.

### C. Muir Wood and Dr. Moses's Evaluation

On July 9, 2019, J. transferred from Sonora to Muir Wood, where he was diagnosed with Cannabis Use Disorder, MDD, Social Phobia, and ADHD. R58 at 24. His mood was described as "Sad, Angry, Depressed, Labile, and Anxious." *Id.* at 11. His insight was labeled "poor" and his judgment "immature." *Id.*

At Muir Wood, J. was evaluated by Dr. James A. Moses, a clinical neuropsychologist. R54 at 1. Dr. Moses performed seven tests and concluded that J. had ADHD in addition to Oppositional Defiant Disorder ("ODD"), and Unspecified Depressive Disorder. *Id.* at 2, 9–10. His report outlined the symptoms of ODD that J. reported over the preceding six months including "very often loses his temper, often argues, very often actively defies or refuses to comply with requests or rules, often blames others for his mistakes or misbehavior, often is touchy or easily annoyed by others, often is angry or resentful, [and] often is spiteful or vindictive." *Id.* at 6. Dr. Moses further observed,

> [J.] reports suicidal <u>ideation</u> that is associated with feelings of inadequacy, worthlessness, and guilt . . . . He appears to have had longstanding feelings of poor self-esteem and guilt that now have potentiated thoughts of self-harm . . . . Recurrent periods of drug and/or alcohol use are indicated to manage his mood issues and his feelings of painfully poor self-esteem . . . . [J.] may struggle to remain outwardly composed and emotionally unexpressive, but he shows little concern for the consequences of acting on impulse. He may show spells of hyperactive and impulsive behavior that are ADHD-related, particularly when he feels strongly conflicted. These episodes may be a source of ongoing conflict in family settings.

*Id.* at 7. Dr. Moses also found that J. had average cognitive abilities and some advanced abilities in arithmetic and spelling. *Id.* at 3–4. On August 13, 2019, J. was discharged from Muir Wood. R58 at 41.

1

2

### D.  Start of School Year and Plaintiffs' Request for a Special Education Evaluation

3

Meanwhile, Plaintiffs were preparing for tenth grade at CFHS. R51 at 1–2. On

4

August, 5, 2019, Plaintiffs emailed J.'s ninth grade counselor, saying,

5

> This summer has been an extremely difficult one for our son

6

> [J.]. We would like to set up a meeting to consider
> [Individualized Education Program ("IEP")][8] options for him.

7

> Can you let us know how to go about doing this for him? He
> has already had an extensive evaluation and has a diagnosis

8

> that qualifies for an IEP. We can discuss more details in

9

> person.

10

*Id.* Plaintiffs were directed to J.'s new counselor, Jessie Petrillo, and told to put "a request

11

in writing to Rhonda King . . . for an IEP meeting. She is the chair of the special

12

education department." *Id.* at 1. That afternoon, Plaintiffs sent an email to Petrillo and

13

King that read,

14

> I am writing to request an IEP meeting for our son, [J.]. He

15

> struggled greatly his freshman year at CFHS as well as this
> summer and has received diagnoses that require an IEP.

16

> Please let us know how we can go about having the meeting

17

> as soon as possible.

18

*Id.* at 3–4. King promptly forwarded the email to Laura Black, a psychologist for the

19

school district, and Eric Singer, a ninth-grade administrator. *Id.* at 3; R92 at 557, 65.

20

On August 7, Black called J.'s mother, Plaintiff E.J. R92 at 565. Plaintiff told

21

Black that J. had been hospitalized and was at Muir Wood with suicidal ideation, a

22

substance abuse problem, and diagnoses for ADHD, ODD, and MDD. R92 at 561, 565;

23

R93 at 311–12. According to Black, Plaintiff said that her son "was too sick to come to

24

Catalina Foothills High School and that [Plaintiff] was considering sending him to Calo

25

Teens [an alternative school]." R92 at 561. Black testified that she told Plaintiff the

26

school had fifteen school days from the date a parent requests a special education

27

evaluation to either hold a meeting or issue a PWN explaining the decision not to

28

[8] Defendant treated Plaintiffs' request for an IEP and IEP meeting as a request for a special education evaluation as this is a necessary precursor to having an IEP.

evaluate. *Id.* at 563.

Plaintiff also informed Black that J. had recently been evaluated by Dr. Moses and Black asked if she could have a copy of the report. *Id.* Plaintiff was worried about confidentiality and did not want to email the report. *Id.* at 562–63; R93 at 314. Instead, Plaintiff dropped off a hard copy for Black later that day. R92 at 563. Ultimately, Black testified that she was not sure what Defendant's responsibilities were and told Plaintiff that she would need to check with her supervisor, Dr. Erin Matyjasik. *Id.* at 562.

On August 8—the first day of the school year—Black called Plaintiff to ask if she could share the Dr. Moses report. *Id.* at 565. Black testified that Plaintiff "specifically told [her] [Plaintiff] didn't want the information shared because it was confidential." *Id.* But Black also testified that Plaintiff gave her permission to share the information with Petrillo and Singer. *Id.* Plaintiff testified that although she was concerned about sending Dr. Moses's report electronically, she never told Black that Black could not share the report with any relevant officials. R91 at 776. According to Plaintiff, she also thought that she would have another opportunity to expand on the details she gave Black before any decision was made. *Id.* at 777.

After getting off the phone with Black, Plaintiff sent an email directly to Dr. Matyjasik, saying:

> On Monday, 08/05/2019, we requested an IEP meeting. We are writing to again request that an IEP meeting be held for our son as soon as possible . . . . [J.] has been diagnosed with a new disorder which will impact his learning and requires intensive psychological therapy services as well as tailored education for his disability. Our child's 504 Plan is not even remotely extensive enough for these new diagnoses. His educational program will need to be revised substantially to address his current needs appropriately and for this reason we are again asking the team to meet regarding an IEP, as our only contacts thus far have not resulted in any progress in that direction. Since our request, for example, we have spoken with Ms. Black twice. Yesterday, Ms. Black said that she would speak to you about options for an IEP . . . . In addition, we request that we be allowed to bring advocates with us to this meeting . . . .

R51 at 9. Dr. Matyjasik responded and advised Plaintiffs that Defendant had fifteen school days to "review existing data or issue a prior written notice, refusing to evaluate." *Id.* at 8. She wrote,

> If our team determines that a review of existing data is necessary, we would then have <u>60 calendar days</u> to complete the evaluation . . . . We are in receipt of [J.]'s neuropsychological evaluation . . . . Since we received your written request on Monday, August 5, 2019, we will conduct a review of existing data or issue a prior written notice to you by Wednesday, August 28, 2019, assuming that your child meets enrollment criteria at that date. Should a meeting be held, you are always welcome to invite advocates or others to the meeting who are knowledgeable of [J.].

*Id.*

Later that day, August 9, Plaintiffs responded to Dr. Matyjasik, saying that their "son [was] out of school sick right now due to his disability . . . ." *Id.* at 7. Within the hour, Dr. Matyjasik clarified that Plaintiffs would need to report J.'s absence each day. *Id.* at 5. Dr. Matyjasik told Plaintiffs that they could fill out a chronic illness absence form. *Id.* at 6.

On August 12, Plaintiffs enrolled J. at CALO, an alternative residential treatment high school in Missouri. R77 at G412. His intake paperwork said that J. had been displaying symptoms of attachment disorder which had "manifested in oppositional tendencies, anxiety, depression, and anger towards his parents, especially his mother." *Id.* Meanwhile, Plaintiffs submitted the Chronic Illness Form to Defendant and continued to call him out sick from CFHS. R51 at 25.

### E. SST Meeting and PWN Refusing Evaluation

On August 21, Petrillo emailed Plaintiffs to schedule a meeting to discuss "alternative options" for J. *Id.* at 13. Petrillo said, "This would not be an IEP meeting, as the Student Study Team [("SST")] agreed that a referral to Special Education is not warranted at this time, but rather a meeting to discuss a general education plan for [J.]." *Id.* at 13–14. This was the first time that Plaintiffs learned about the SST and Defendant's

decision not to evaluate J. for special education. R93 at 363.

That same day, before seeing Petrillo's email, Plaintiffs followed up with Dr. Matyjasik regarding their request for an IEP meeting and reiterated that J. was struggling with anxiety and depression and had felt overwhelmed by school. R51 at 18. Their email also spoke about J.'s hospitalizations over the summer and informed Dr. Matyjasik, "As of August 11th, [J.] has been transferred to a longer-term Residential Treatment Center in Missouri." *Id.* After seeing Petrillo's email, Plaintiffs sent another email to Dr. Matyjasik and asked if, in light of their message to her earlier in the day, she would "reconsider the decision to refuse the referral for special education[.]" *Id.* at 15.

On August 26, Plaintiffs submitted a chronic illness certification from Dr. Adolfo Martinez Castelo confirming J.'s diagnoses for ADHD, Anxiety Disorder Unspecified, and Mood Disorder Unspecified. R73 at B59. Dr. Matyjasik responded in receipt of the certification and told Plaintiffs that she did not overturn SST decisions; she also advised that Plaintiffs would receive a PWN explaining Defendant's decision not to evaluate. *Id.* at B58.

On August 28, Black emailed Plaintiffs a PWN dated August 22 as well as a copy of the Procedural Safeguards and Parent Rights. R51 at 22. The PWN informed Plaintiffs that an SST met on August 21 to discuss Plaintiffs' request for a special education evaluation. R48. It stated, "[t]he School District has decided not to conduct a comprehensive evaluation of [J.] for special education at this time." *Id.* at 2.

An SST "reviews information about students. [It] look[s] for students that might be having discrepancies in their school work, teacher concern, a counselor concern or possibly an administrative concern and maybe possibly putting some interventions into place to help the student be successful or more successful in that class or in their classes." R92 at 523. Jody Brase, CFHS Principal, testified that "suicidal ideation or attempted suicide" would not ordinarily be a reason to refer a student to the SST. R92 at 525. The PWN does not specify the members of the SST. R48.

The SST reviewed J.'s educational records, including all available standardized test scores and grades from fourth through ninth grade. *Id.* at 1. It also reviewed J.'s 504

Plan and past reviews of his 504 Plan, as well as input from J.'s ninth grade teachers. *Id.* at 1–3. The SST did not consider input from tenth grade because J. had not yet attended school that year in the district. *Id.* at 3.

The PWN also said that the SST reviewed two of J.'s psychological evaluations. *Id.* It first claimed that the SST reviewed Dr. Moses's July 22, 2019 report that diagnosed J. with ADHD, ODD, and Unspecified Depressive Disorder. *Id.* Second, it said the SST reviewed the "Certification of Chronic Health Conditions completed by Adolfo A. Martinez Castelo, MD on 8/26/19." *Id.* However, the two members of the SST who testified before the ALJ—Brase and Black—clarified that the SST did not in fact receive a copy of the Dr. Moses report. R92 at 530, 570. Brase actually testified that she did not know J. had been hospitalized after ninth grade, although she was not sure it would have impacted her decision not to evaluate. R92 at 526–30; 543. Notably, Brase testified that, in terms of diagnoses, she was only aware that J. had ADHD and that a 504 Plan was in place to address it. *Id.* at 530.

Black testified that she did not share a copy of the Dr. Moses report or the fact of his hospitalizations with the rest of the SST, but she "shared the results of the testing, the cognitive and achievement testing, because that's relevant to what we would have done as an evaluation at a school and the diagnoses." *Id.* at 570, 625. Black also testified that she told the SST that J. had been at Muir Wood and that his parents said that "he was too sick to come to school and they were considering Calo Teens." *Id.* at 571. According to Black, the mere fact of J.'s disability or hospitalizations would not have qualified him for an evaluation if his academic records did not suggest he needed additional help. *Id.* at 588.

On September 16, Plaintiffs emailed Dr. Matyjasik to ask if they

> have a right to an Independent Educational Evaluation [("IEE")] since we disagree with your conclusion that [J.] does not need an evaluation? The procedural safeguards notice says if the school evaluates and we disagree with the evaluation, then we can request an Independent Educational Evaluation. But it doesn't say what happens if the school refuses to perform an evaluation.

R27 at 3.

They did not receive a response. On September 17, Plaintiffs again emailed Dr. Matyjasik to say, "we are not understanding how you determined that an evaluation is not warranted in light of all the new information we provided you, especially everything in Dr. Moses' report. Is there anything more you can tell us about that decision?" R51 at 28. The email further expressed Plaintiffs' concerns that J.'s 504 Plan would be insufficient to address his current needs. *Id.* Plaintiffs said the 504 Plan did not "address any of his other struggles, or the oppositional defiant disorder, or his suicidal ideation. Do you have any programs or schools for that?" *Id.*

Dr. Matyjasik then replied,

> Everything you need to know about the basis of the decision is included in the prior written notice that was provided to you by the school. In that notice, it stated that "[J.]'s records do not indicate any academic concerns that would warrant a referral for a special education evaluation." It then documents all of the information used to make that determination. In other words, based on available data, we are able to provide him FAPE [a free appropriate public education as required by law] with the supports that are in place for him . . . . I am looking into your question related to Independent Educational Evaluations and will get back to you as soon as possible . . . .

R51 at 27. The record does not indicate that Dr. Matyjasik responded again.

In November 2019, Plaintiffs hired Dr. Quinten Harvey to conduct an IEE for $4,100.00. R78 at H9-26; R55 at 2. Dr. Harvey issued a report on January 11, 2020 that diagnosed J. with Generalized Anxiety Disorder, Persistent Depressive Disorder, Attachment-Related Disorder, ADHD, Cannabis Use Disorder, ODD, and Personal History of Self-Harm. R55 at 27. Dr. Harvey noted that J. needed "continued residential schooling" and "individualized academic intervention." *Id.* He opined that J.'s "emotional adjustment has compromised his academic progress" and "[h]is emotional and behavioral reactivity, depression, anxiety, depleted self-esteem, and social deficits have resulted in a barrier to his ability to independently function in daily life and are inextricably

intertwined with his educational needs." *Id.* Dr. Harvey suggested, among other things, that "in his academic setting, [J.] requires predictable structure, reduced class size, increased one-on-one attention, and a highly structured environment with predicable rewards and consequences." *Id.* at 28.

## II.     Administrative Proceedings

On January 14, 2020, Plaintiffs filed a Complaint and Request for Due Process Hearing Under IDEA with the Arizona Department of Education ("ADE"). R2 at 1. The Complaint raised the following issues:

1. Whether the District violated its Child Find obligation by failing to identify and evaluate Student for special education and related services and thereby denied Student a FAPE?
2. Failure to evaluate: Whether the District wrongfully refused Parents' request for an evaluation for special education and related services?
3. Failure to evaluate: Whether the District's refusal of Parents' request for an evaluation deprived Parents of their right to meaningfully participate in the decision-making process regarding the provision of a FAPE to Student?
4. Whether the District violated the IDEA by failing to timely respond to Parents' request for an IEE?
5. Whether Parents are entitled to reimbursement for the evaluation they obtained at their own expense after the District failed and refused to respond to their request for an IEE?
6. Whether Student requires a residential treatment center to receive educational benefit?
7. Whether CALO is an appropriate educational location for Student to receive educational benefit?
8. Whether compensatory and/or prospective education, and/or other relief, is appropriate for any of the foregoing violations?

*Id.* at 16–17. The ADE referred the Complaint to the Office of Administrative Hearings ("OAH") for a hearing before an ALJ. R3 at 1. A four-day hearing was held beginning May 18, 2020. R91–R94. The ALJ issued her decision on October 2, 2020 and then issued an amended decision on December 14, 2020. R89–R90. The ALJ found that the

District had not violated the IDEA. R89 at 19–23; R90 at 18–20.[9]

The ALJ said that J.'s "overall grades, test scores, and in-class behavior did not indicate that he was 'struggling,' despite the fact that Student did not consistently utilize supports provided in his 504 Plan." R89 at 20. She further noted that "no evidence was presented to establish that Student had a serious emotional disturbance over a long period of time that adversely affected his educational performance or that he required specially designed instruction due to complications *related to his ADHD*." *Id.* (emphasis added). The ALJ therefore concluded that the District had not wrongfully denied Plaintiffs' request to evaluate J. because, in August 2019, the District had no reason to suspect that J. was a child with a disability notwithstanding his ADHD. *Id.* at 20–21.

The ALJ also found that the District did not deny Plaintiffs the right to meaningfully participate in the decision-making process because "[t]he FAPE provisions of the IDEA are only extended after a student is determined to be eligible to receive special education and related services." *Id.* The ALJ concluded that the District did not have an "obligation to accept every parental request, and may not adopt an inappropriate program only to quell insistent parents." R90 at 19.

The ALJ further reasoned that Plaintiffs were not entitled to reimbursement for an IEE because "Parents did not ask for an IEE, rather they asked for a clarification regarding their rights." R89 at 21. And, to the extent this could be construed as a request, "Petitioners would not be entitled to an IEE because Respondent did not evaluate Student. The law clearly provides that IEE privileges are triggered only after a district has evaluated a student . . . ." *Id.* Relatedly, the fact that the District "failed to respond to their request [for an IEE] 'without unnecessary delay' is irrelevant" because they were not entitled to an IEE in the first place. *Id.*

Finally, the ALJ concluded that "[f]rom August 05, 2019, when Parents submitted their special education evaluation request to Respondent, through and up until Student was withdrawn as a student on September 20, 2019, *Student was not eligible for special*

---

[9] The Court has only provided further details on the findings that Plaintiffs have appealed.

*education and related service because his disability did not adversely affect his academic performance or ability to access the general education curriculum*." *Id.* (emphasis added).

On November 6, 2020, J.'s parents appealed some of the ALJ's findings to this Court. (Doc. 1.) Specifically, Plaintiffs appeal the decision:

> (1) that found the District did not wrongly refuse Parents' request for an evaluation; (2) that found the District's refusal of Parents' request for an evaluation did not deprive Parents of their right to meaningfully participate in the decision-making process regarding the provision of a FAPE to Student; (3) that found the District did not violate the IDEA by failing to timely respond to Parents' for an Independent Educational Evaluation ("IEE"); and (4) that denied reimbursement to Plaintiffs for the evaluation they obtained.

(Doc. 17 at 1–2.)

## III.    Standard of Review

Under the IDEA, a district court reviewing the administrative result of a due process hearing considers the record of the administrative proceedings, hears additional evidence at the request of a party, and then, "basing its decision on a preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).[10] The district court need not employ a highly deferential standard, but it does give "due weight" to the ALJ's determinations. *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). Affording due weight means to "consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *Michael P. v. Dept. of Educ.*, 656 F.3d 1057, 1066 (9th Cir. 2011) (quoting *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1212 (9th Cir. 2008)).

"The district court has discretion to determine how much deference to give to administrative findings, but . . . must accord more deference to thorough and careful

---

[10] The parties have agreed to limit this matter to the existing administrative record. (Doc. 17 at 15 n.6.)

administrative findings." *Parenteau v. Prescott Unified Sch. Dist.*, No. CV 07–8072–PCT–NVW, 2008 WL 5214997, at *1 (D. Ariz. Dec. 11, 2008); *see also M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017). "[N]either the duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion can ensure that the ALJ was 'thorough and careful.'" *M.C.*, 858 F.3d at 1194 (finding that the district court erred in affording deference to the ALJ where the ALJ wrote a long opinion and questioned witnesses but did not address all the issues and disregarded some of the evidence). Thus, the district court must "examine the record to determine whether it supports the ALJ's opinion." *Id.* at 1194 n.1.

## IV.    Discussion

The Individuals with Disabilities in Education Act ("IDEA") was created to ensure that all students with a disability receive a free appropriate public education ("FAPE"). 20 U.S.C. §§ 1400(d), 1412(a)(1)(A); *see also Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1109–10 (9th Cir. 2016) (discussing legislative history). This imposes on states what is known as the "Child Find" obligation whereby states must locate and identify children with suspected disabilities. 20 U.S.C. § 1412(a)(3)(A). "Once identified, those children *must be evaluated and assessed for all suspected disabilities* so that the school district can begin the process of determining what special education and related services will address the child's individual needs." *Timothy O.*, 822 F.3d at 1110 (emphasis added); 20 U.S.C. § 1414(b)(3)(B).

### A.  The District's Refusal of Plaintiffs' Request to Evaluate J. for Special Education Eligibility

Plaintiffs first appeal the ALJ's decision that the District did not wrongfully refuse their request to evaluate J. to determine if he was a "child with a disability." (Doc. 17 at 1, 17.) They argue that the District's lack of suspicion "does not apply" and the District was required to evaluate J. because the parents specifically requested an initial evaluation. (*Id.* at 19.) Plaintiffs assert that the ALJ's conclusion should not be afforded deference because, by focusing on the District's suspicion regarding whether J. was a child with a disability, the ALJ conflated the Child Find obligation with the requirement

to evaluate upon parental request. (*Id.*) Finally, Plaintiffs emphasize that neither the IDEA, nor its regulations, allows a school district "to determine whether a child is a child with a disability *without* an evaluation." (*Id.* at 18 (emphasis added).)

As a threshold matter, Defendant asserts that the ALJ found on Issue 1 (Child Find) that J. is in fact not a child with a disability. (Doc. 23 at 11.) Because Plaintiffs did not appeal Issue 1, Defendant concludes that "the law of this case is that (1) CFSD had no reason to suspect that J.[] was a 'child with a disability,' and (2) J.[] is *not* a 'child with a disability,' and (3) J.[] is *not* entitled to FAPE." (*Id.* at 12.) Therefore, Defendant argues that Plaintiffs cannot succeed because Plaintiffs have conceded J. is not a child with a disability and the IDEA only applies to children with disabilities. (*Id.*)

Alternatively, Defendant maintains that the IDEA permits a school district to refuse to evaluate a student. (*Id.* at 13.) Defendant emphasizes that the law only provides that a parent may "initiate a request for an evaluation" but it does not require the District evaluate simply because a parent requests it. (*Id.* (citing 20 U.S.C. § 1414(a)(1)(B)).)

### i.  Applicable Law

The statute and its implementing regulations clarify that "either a parent of a child . . . or a local educational agency [i.e., school district] may initiate a request for an initial evaluation to determine if the child is a child with a disability." 20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b). But not every parental request has to result in an evaluation. *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796, 801 (9th Cir. 1996); *see also* 34 C.F.R. § 300.503(a)(2) (contemplating refusal by mandating prior written notice to the parents if the district refuses to initiate an evaluation).

Nonetheless, the Ninth Circuit has held that a school district *must* evaluate a student for all suspected disabilities "when the district has notice that the child has displayed symptoms of that disability." *Timothy O.*, 822 F.3d at 1119. And "[t]he 'informed suspicions of parents, who may have consulted outside experts,' trigger the requirement to assess, even if the school district disagrees with the parent's suspicions . . . ." *Id.* at 1120–21 (quoting *Pasatiempo*, 103 F.3d at 802). In *Timothy O.*, the Ninth Circuit concluded that a school district violated the IDEA when it failed to provide the sort of

comprehensive evaluation contemplated by the statute to assess whether one of its students had autism despite the fact that the parents had expressed concerns about autism and had given the school a report that "provisionally" diagnosed the student with autism. *Id.* at 1121. The court clarified:

> A school district cannot disregard a non-frivolous suspicion of which it becomes aware simply because of the subjective views of its staff, nor can it dispel this suspicion through informal observation. Rather, such notice automatically triggers mandatory statutory procedures; the school district *must* conduct an assessment for all areas of the suspected disability using the comprehensive and reliable methods that the IDEA requires.

*Id.* at 1121–22.

The initial evaluation must be comprehensive and reliable so as to provide the most complete picture of the student's needs. *Id.* at 1110. Accordingly, a school district evaluating a child for a suspected disability "shall use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining whether the child is a child with a disability . . . ." 20 U.S.C. § 1414(b)(2)(A)(i); 34 C.F.R. § 300.304. The district may "not use any single measure of assessment as the sole criterion for determining whether the child is a child with a disability" and it must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. §§ 1414(b)(2)(B)–(C).

After the evaluation, "[a] group of qualified professionals *and the parent of the child* determines whether the child is a child with a disability . . . and [t]he public agency provides a copy of the evaluation report and the documentation of determination of eligibility at no cost to the parent." 34 C.F.R. §§ 300.306(a)(1)–(2) (emphasis added). A "child with a disability" is defined as:

> *a child evaluated in accordance with §§ 300.304 through 300.311* as having an intellectual disability, a hearing

> impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as "emotional disturbance"), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

34 C.F.R. § 300.8(a)(1) (emphasis added). An emotional disturbance exists when the student has exhibited at least one of the following symptoms "over a long period of time and to a marked degree that adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(4)(i). These include:

> (A)  An inability to learn that cannot be explained by intellectual, sensory, or health factors.
> (B)  An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> (C)  Inappropriate types of behavior or feelings under normal circumstances.
> (D)  A general pervasive mood of unhappiness or depression.
> (E)  A tendency to develop physical symptoms or fears associated with personal or school problems.

*Id.* §§ (c)(4)(i)(A)–(E).

When the group interprets data from an evaluation to determine whether the student is a child with a disability, it must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; and [e]nsure that information obtained from all these sources is documented and carefully considered." 34 C.F.R. §§ 300.306(c)(1)(i)–(ii). If the student is determined to have a disability, the results of the initial evaluation form the basis for the student's IEP. *Timothy O.*, 822 F.3d at 1111.

### ii.  Analysis

First, the Court disagrees with Defendant's argument that the IDEA does not apply to Plaintiffs' claims. As Plaintiffs clarify in their Reply, they do not concede that J. is not

- 17 -

a child with a disability. (Doc. 24 at 4.) Instead, they maintain that there was not enough information to answer the question of whether J. is a child with a disability "because there was no comprehensive school evaluation . . . ." (*Id.*) Furthermore, the Court notes that the ALJ did not conclude on Issue 1 that J. was not a child with a disability. R89 at 19–20. The ALJ found that the District had no evidence that J. had a serious emotional disturbance that would have qualified as a disability, but it was not until the end of the ALJ's opinion that she stated, "Student was not eligible for special education and related service because his disability did not adversely affect his academic performance or ability to access the general education curriculum." *Id.* at 23.

Moreover, the Court finds that the District did not comply with its obligations when it refused to evaluate J. after Plaintiffs, prompted by their serious concerns regarding J.'s suicidal behavior and new diagnoses, asked for an IEP.[11] A school district does not have to conduct an evaluation for special education simply because it is what the parent wants. *See Pasatiempo*, 103 F.3d at 801; 34 C.F.R. § 300.503(a)(2). This would require school districts to expend significant resources on comprehensive assessments for otherwise frivolous parental requests.

However, *Timothy O.* makes clear that it is not about the request itself but rather what a parental request for evaluation can trigger for the school district. 822 F.3d at 1119–21. If a parent's request for a special education evaluation puts the school district on notice that a student may have a disability, the school district must evaluate for that suspected disability. *Id.*; 20 U.S.C. § 1414(b)(3)(B). The District should have evaluated J. not merely because Plaintiffs asked for an evaluation, but because Plaintiffs' request, communication, and documentation put the District on notice that J. had received diagnoses for new suspected disabilities beyond his ADHD and that he had exhibited symptoms of these conditions. Plaintiff E.J. explicitly informed Black and Dr. Matyjasik that J. had suicidal ideations, had been hospitalized after his ninth grade year, and was diagnosed with ODD and MDD in addition to his ADHD, and provided a copy of Dr.

---

[11] The District interpreted this request as a request for an evaluation because an evaluation is a necessary precursor to an IEP.

Moses's report that offered further detail about these diagnoses. The District nonetheless decided not to evaluate J. because his 504 Plan was satisfying the needs of his ADHD.

Furthermore, the SST Meeting was not an "evaluation." The SST apparently lacked critical information, although Plaintiffs provided that information to school officials. Specifically, the SST never received a copy of Dr. Moses's report before it decided not to evaluate. Brase also testified that, despite Black's contention that she told the SST about J.'s diagnoses, Brase was only aware that J. had ADHD. Brase had no knowledge of J.'s hospitalizations or his diagnoses for ODD, MDD, or Unspecified Depressive Disorder. Although the PWN claimed that the SST reviewed Dr. Castelo's Certification of Chronic Health Conditions—which diagnosed J. with ADHD, Anxiety Disorder Unspecified, and Mood Disorder Unspecified—this would have been impossible given that the certification was completed and sent on August 26 and the SST Meeting occurred on August 21.

The SST reviewed educational records and teacher input that, although relevant, only provided evidence about J. *before* he was diagnosed with ODD, MDD, and Unspecified Depressive Disorder. Similarly, the 504 Plan that the SST reviewed was only designed to address J.'s ADHD. And while the District could not consider J.'s achievement at CFHS post-diagnosis because J. had not yet attended school that year, it could have solicited further information from Plaintiffs. Therefore, the SST Meeting did not assess an accurate and complete picture of J.'s situation and the District did not afford Plaintiffs the opportunity to fill in those gaps prior to concluding that it would not evaluate.

The Court finds that Plaintiffs have shown by a preponderance of the evidence that the District wrongfully refused their request to evaluate J. for special education. Although the ALJ considered whether the District should have suspected that J. had a disability, here, Plaintiffs' suspicion and subsequent communication with the District was enough to trigger the District's duty to conduct a comprehensive evaluation. The Court does not opine about what the outcome of an evaluation would have been, nor does it conclude that J. is (or is not) a child with a disability under the statute. The Court merely concludes

that the District should have undertaken an assessment to properly answer this question instead of relying on the SST Meeting or any other informal and incomplete observation.

### B. Parents' Right to Meaningfully Participate in the Decision-Making Process

The second issue that Plaintiffs appeal is whether the District's refusal of their request to evaluate J. for special education denied Plaintiffs a procedural right to meaningfully participate in the decision-making process regarding their child's FAPE. (Doc. 17 at 1–2.) They assert that the ALJ erroneously found that procedural protections only apply *after* a student is determined to be a "child with a disability." (*Id.* at 20–21.) Plaintiffs argue that, by refusing to evaluate and instead holding the SST Meeting, the District wholly excluded the parents from the decision of whether J. was a child with a disability who required an IEP. (*Id.* at 20–25.) That exclusion, Plaintiffs contend, is a violation of the IDEA and denied J. a FAPE. (*Id.* at 25.)

In response, Defendant highlights that only children with disabilities are entitled to a FAPE and, therefore, only parents of children with disabilities have a procedural right to meaningfully participate in their child's FAPE. (Doc. 23 at 20.) Because, Defendant asserts, J. is not a "child with a disability," these provisions apply neither to him nor his parents. (*Id.* at 21.) Furthermore, Defendant argues that even if the refusal to evaluate and the exclusion of Plaintiffs from that determination were a procedural violation, not all procedural violations actually deny a FAPE within the meaning of the statute. (*Id.* at 20–21.)

### i.   Applicable Law

One of the primary goals of the IDEA is "strengthening the role and responsibility of parents and ensuring that families of [children with disabilities] have meaningful opportunities to participate in the education of their children at school and at home." 20 U.S.C. § 1400(c)(5)(B); *T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 193 (3d Cir. 2021) ("[T]he parental right of meaningful participation could rightly be called a 'basic goal' of the IDEA . . . ."). Accordingly, "[t]he identification of children who have disabilities should be a cooperative and consultative process." *Pasatiempo*, 103 F.3d at 802; *see also*

*M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 851 (9th Cir. 2014) (citing 20 U.S.C. § 1414) ("The IDEA provides for a cooperative process between parents and schools that culminates in the creation of an IEP for every disabled student.").

The IDEA contains numerous provisions that facilitate meaningful parental participation throughout the process of identification, evaluation, and creation or adjustment of an IEP. *See, e.g.*, 20 U.S.C. § 1414(a)(1)(B) (a parent may request an initial evaluation for special education eligibility); 20 U.S.C. §§ 1414(a)(1)(C)–(D) (requiring parental consent for evaluation); 20 U.S.C. § 1414(b)(1) (requiring the school district give notice to the parents that describes any proposed evaluation); 20 U.S.C. § 1414(b)(2)(A) (including information from the parents as one of the things the school district must consider as part of an evaluation); 20 U.S.C. §§ 1414(b)(4)(A)–(B) (requiring parental involvement following an evaluation to determine whether the student is a child with a disability and requiring that the parents receive a copy of the evaluation report and eligibility determination); 34 C.F.R. § 300.306(a)(1) (same); 20 U.S.C. § 1414(d)(1)(B)(i) (including the parents in the IEP team); 20 U.S.C. §§ 1415(b)–(g) (outlining procedural safeguards specifically for parental involvement, oversight, and appeal); 34 C.F.R. § 300.503(a)(2) (requiring the school district provide written notice to parents before it "[r]efuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child"). A number of these points of parental involvement occur *before* any determination is made as to whether the student is a "child with a disability." In fact, the parents are "an integral part of the team that determines [] whether the child is a child with a disability . . . ." *M.M.*, 767 F.3d at 851. Accordingly, one of the procedural safeguards outlined in the statute specifically protects a parent's opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to the child . . . ." 20 U.S.C. § 1415(b)(1).

A school district is required to comply with both the substantive provisions and the procedural safeguards of the IDEA. 20 U.S.C. § 1415(a). Not all procedural violations mean that the school district denied a FAPE. 34 C.F.R. § 300.513(a). However, "those

procedures which provide for meaningful parent participation are particularly important." *M.M.*, 767 F.3d at 851 (quoting *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001)). Therefore, a school district may violate the IDEA and deny a FAPE by "[s]ignificantly imped[ing] the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child." 34 C.F.R. § 300.513(a)(2)(ii).

### ii. Analysis

Here, the Court finds that the District violated the IDEA by denying Plaintiffs the opportunity to meaningfully participate in the decision-making process regarding J.'s evaluation. The District not only refused to evaluate J., but it left Plaintiffs out of this decision entirely. The District first told Plaintiffs that they could attend a meeting and even invite advocates. Instead, the District held an SST Meeting and informed Plaintiffs after the fact. Plaintiffs should have been able to participate in meetings regarding the identification and evaluation of their child with a suspected disability. *See* 20 U.S.C. § 1415(b)(1).

Moreover, even if the District does not include parents in an SST Meeting, the District could have solicited Plaintiffs' contribution to this decision-making process in some other manner. Not only did the District exclude Plaintiffs from the SST Meeting, but it also excluded their input by seemingly failing to consider the information that Plaintiffs had already provided as well as any additional information Plaintiffs could have provided about J.'s condition had they been given the chance to do so.

Furthermore, the PWN that the District sent Plaintiffs would not have given Plaintiffs an accurate idea of what the SST had considered—or not considered—given that Dr. Moses's report and Dr. Castelo's report were erroneously listed as documents that were reviewed, and the District would not give Plaintiffs any additional details about the SST Meeting when Plaintiffs asked Dr. Matyjasik. Altogether, this series of events significantly impeded Plaintiffs' "opportunity to participate in the decision-making process regarding the provision of a FAPE" because they were excluded from deciding whether J. should even be evaluated for eligibility for special education. *See* 34 C.F.R. §

300.513(a)(2)(ii). Although the ALJ considered whether J. was entitled to a FAPE, she did not consider Plaintiffs' rights to participation that preceded any determination that J. was a child with a disability or that entitled them to be involved in making that very determination.

**C. The District's Failure to Timely Respond to Parents' IEE Request and Right to Reimbursement**

The final two issues on appeal are whether the District violated the IDEA when it did not timely respond to Plaintiffs' request for an IEE and, if so, whether Plaintiffs are entitled to reimbursement for the IEE they obtained. (Doc. 17 at 2.) Plaintiffs argue that an IEE is a procedural right and Plaintiffs were entitled to those procedural protections even though the District refused to evaluate J. (*Id.* at 25.) They assert that the District was required to either file a due process complaint to defend its eligibility decision or allow an IEE. (*Id.* at 26.) The fact that the District did neither "rewarded the District for its own inaction." (*Id.*)

Defendant argues that the District owed no responsibility to timely respond because Plaintiffs never *requested* an IEE. (Doc. 23 at 21.) Like the ALJ, Defendant contends that Plaintiffs simply asked for clarification regarding their rights to an IEE. (*Id.*; R89 at 21.) However, Defendant "acknowledges that as a matter of good public relations, Dr. Matyjasik probably should have responded to the Parents' request for an explanation by telling them that she was not the person to give them legal advice regarding their rights." (Doc. 23 at 21.) Moreover, Defendant argues that Plaintiffs cannot be entitled to reimbursement for their IEE because there was never an initial evaluation to contest. (*Id.* at 22.)

**i.  Applicable Law**

Under the IDEA, "[a] parent has the right to an [IEE] at public expense if the parent disagrees with an evaluation obtained by the public agency . . . ." 34 C.F.R. § 300.502(b)(1). "If a parent requests an [IEE] at public expense, the public agency must, without unnecessary delay either [file] a due process complaint to request a hearing to show that its evaluation is appropriate; or [e]nsure that an [IEE] is provided at public

expense . . . ." *Id.* §§ 300.502(b)(2)(i)–(ii). The right to obtain an IEE is one of the IDEA's procedural safeguards. 20 U.S.C. § 1415(b)(1).

ii.  **Analysis**

The Court finds that the District violated the IDEA by failing to respond at all to Plaintiffs' IEE request. First, the record as a whole does not support the ALJ's conclusion that Plaintiffs never requested an IEE but merely sought to clarify their rights regarding one. Inartful as it may have been, Plaintiffs clearly intended to ask for the next steps to obtaining an IEE. Their email expressed confusion about whether they could get an IEE because they disagreed with the District's decision not to evaluate J. The Court agrees with Defendant that the District should have at least directed Plaintiffs to where they could get information about their rights. Instead, Dr. Matyjasik told Plaintiffs that she would get back to them about their question and never did. As fully outlined above, the IDEA places emphasis on parental rights and it would contradict that value to require parents to use specific language to "request" an IEE versus merely ask about one.

Second, as the Court previously concluded, the District should have evaluated J. based on the suspicion of disability that Plaintiffs' request for evaluation alerted it to. Had the District evaluated J., and indeed concluded that he was not a child with a disability, Plaintiffs would have been entitled to a publicly funded IEE to contest the District's determination that J. was not eligible for special education. Accordingly, the Court finds that Plaintiffs are entitled to reimbursement for Dr. Harvey's IEE.

**D.  Conclusion**

In accordance with this Order, the Court finds in favor of Plaintiffs. Defendant shall reimburse Plaintiffs for the $4,100.00 spent to obtain an independent evaluation from Dr. Harvey.

///

///

///

///

///

Plaintiffs have also asked that the Court allow additional briefing on attorneys' fees. (Doc. 24 at 17.) The parties may submit motions for attorneys' fees.

The Clerk of Court shall docket accordingly and close the case file in this matter.

Dated this 4th day of May, 2023.

Honorable Raner C. Collins
Senior United States District Judge